IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

ARLINGTON CAPITAL, LLC,          }
                                 }
        Plaintiff,               }
                                 }        CIVIL ACTION NO.
v.                               }        05-AR-1362-S
                                 }
RAIL PARTNERS, L.P., et al.,     }
                                 }
        Defendants.              }

## MEMORANDUM OPINION

Before the court is the motion of defendants, Rail Partners, L.P., Rail Management Corporation, K. Earl Durden ("Earl Durden"), Michael E. Durden ("Michael Durden"), and D. Scott Helms ("Helms") (together, "Rail") for summary judgment in the above-entitled action brought by plaintiff, Arlington Capital, LLC ("Arlington"), for breach of contract, for fraudulent misrepresentation and suppression, and for relief under the principles of *quantum meruit*. For the reasons that follow, Rail's motion will be granted in part and denied in part.

*Facts*

Some of the facts material to Rail's summary-judgment motion are disputed. The following facts are presented in the light most favorable to Arlington, the non-movant.

This action arises from a potential business deal that went sour. Rail was a business founded by chairman, CEO, and partial owner, Earl Durden. Its chief operating officer and other partial owner was Mike Durden, and its chief financial officer was Helms.

Rail's principal place of business was located in Panama City Beach, Florida.  Arlington is a group of financial advisors that offers guidance on business transactions, including the buying and selling of companies.  Arlington is led by managing member, Vann Russell, a C.P.A. who worked in tax and audit accounting at the firm Deloitte & Touche for ten years before joining Arlington in July 2004.  Arlington's principal place of business is located in Birmingham, Alabama.

In July 2004, Russell telephoned Helms to advertise Arlington's services.  The men discussed the possibility of selling Rail.  During their conversation Russell offered Arlington's services to help facilitate such a deal.  Through July and August 2004, Russell had several telephone conversations with Helms and with Mike Durden.  During these conversations, the Rail officers told Russell that Rail would not pay Arlington any commission in the event of a sale, and that Arlington would have to receive any compensation for its services from any buyer it procured.  Russell assured Rail during these conversations that he understood that Rail would not be required to pay Arlington a commission.

During Russell's talks with Rail, Helms and Mike Durden told Russell that Rail preferred to sell to a "financial" buyer, and that it did not intend to sell to a "strategic" buyer. A financial buyer is generally interested in the return it can receive from buying a business, whereas a strategic buyer is generally

interested in how the target company fits into its own long-term business plan.  Although Rail clearly expressed its preference and intent, it told Arlington that it might in the future consider trying to sell to a strategic buyer.  Russell was aware during these early conversations that Earl Durden knew of some potential strategic buyers, and that Earl Durden would probably want to be involved in any negotiations with any potential strategic buyers. In particular, Helms told Russell that although Rail did not intend to sell to a strategic buyer, Earl Durden knew an officer at G&W and that "if for whatever reason [G&W was] brought in the process down the road, that Earl would want to be involved."

On October 4, 2004, Arlington and Rail executed a written confidentiality agreement.  That agreement, which was written on an Arlington letterhead, provided in its entirety:

CONFIDENTIALITY AGREEMENT

October 4, 2004

Mr. Scott Helms
Rail Management Corporation
2605 Thomas Drive
Panama City Beach, Florida 32408

Gentlemen:

You have agreed to discuss with Arlington Capital, LLC a possible financial transaction related to Rail management Corporation ("Rail" or the "Company"), a short-line railroad operation based in Panama City Beach, Florida.  As a condition to such discussions, you have required that we agree to keep strictly confidential all information conveyed to us in whatever form, whether

written or oral, regarding the Company and to refrain from using the same except as provided below.

This letter, which is enforceable under Florida law, will confirm our agreement with Rail to retain in strict confidence all information conveyed to us by you or the Company regarding this matter, unless such information is or becomes available to us on a nonconfidential basis from a source other than you, provided that such other source is not in consideration of whether to purchase Rail and we will not otherwise use it in our business or disclose it to others, except that we shall have the right to communicate the information to such of our directors, officers, employees (if any), and agents who are required by their duties to have knowledge thereof, provided that each such person is informed that such information is strictly confidential and subject to this agreement and agrees not to disclose or use such information except as provided herein. We hereby agree to be jointly and severally responsible for any breach of this agreement by our agents, employees, or representatives. We agree not to initiate, contact or engage in discussions with any employee, customer, or supplier of the Company without the prior written consent of Rail.

We agree that, without prior consent of Rail, we will not disclose to any other person that we have received information regarding Rail, that we are in discussions or negotiations with Rail as to a possible financial transaction or that Rail is considering a possible sale of the Company.

We agree until a formal advisory agreement is executed between Arlington Capital, LLC and the Company that the Company has no legal obligation of any kind whatsoever with respect to any such transaction by virtue of this agreement or otherwise. In the event that we do not enter into a formal advisory agreement between Arlington Capital, LLC and the Company, we agree to return to you immediately upon request all financial and other written information provided to us relating to the Company together with all copies of such information in our possession or to which we have access.

Rail has the right to injunctive or equitable relief in the event of any breach by Arlington Capital, LLC of any provision under this Confidentiality Agreement.

4

Arlington Capital, LLC hereby indemnifies Rail in the event of any breach of this Confidentiality Agreement.

The undersigned is duly authorized to bind us to this agreement.

s/ Vann Russell
Vann A. Russell
Managing Member – Arlington Capital, LLC

Acknowledged   s/ D. Scott Helms
Authorized Signer – Rail

\* \* \*

Arlington signed the agreement in Birmingham, Alabama and then sent it to Rail in Panama City Beach, Florida, where Helms signed it for Rail. The parties never entered into any "formal advisory agreement" that might have been contemplated by the October 4, 2004 agreement.

After the parties executed the confidentiality agreement, Arlington sought with Rail's permission a number of potential financial buyers. Arlington subsequently entered into fee agreements with three potential financial buyers: Berkshire Partners LLC ("Berkshire"); CitiGroup Venture Capital Equity Partners, L.P. ("CVC"); and Saunders, Karp, and Megrue. Arlington structured these written agreements in light of Rail's indication that it would not pay Arlington a commission; each of the three fee agreements contained a "Buy-Side Fee" clause wherein the potential buyer agreed that it would pay Arlington a fee if it bought Rail's stock or assets.

In November 2004, CVC and Berkshire sent Rail proposals regarding the possible purchase of Rail.  CVC sent a letter of intent stating that CVC was "quite comfortable offering $190.0 million - $200.0 million for all the stock of Rail Management." Berkshire's letter of intent stated that "[w]e propose acquiring 100% of the stock of Rail Management for a total purchase price between $180 million and $210 million."  Before Arlington's efforts, Rail had not received a formal or informal appraisal to establish its value.  However, sometime in 2003, Rail officials met with investment banker, Bill Levin, to discuss a possible sale of Rail.  Levin told Rail that based on the amount of capital in the market at that time, he thought it could sell the company for between $140 million and $180 million.

The next business day after Rail received the letters of intent from CVC and Berkshire, Earl Duren contacted a competitor in the rail business, Genesee & Wyoming ("G&W"), to discuss the possible sale of Rail to G&W as a strategic purchser.  Rail did not tell Arlington at the time that it was speaking to and pursuing a possible sale to G&W.  Nevertheless, Rail concurrently instructed Arlington to continue negotiating with CVC and Berkshire to increase the value of their offers.

Shortly after Rail contacted G&W in November 2004, it provided G&W with a "Confidential Information Memorandum," which contained information "provided to the recipient in order for them to further

evaluate its interests in a potential acquisition of [Rail], and to reevaluate and give recipient an opportunity to revise its proposed Letter of Intent. . . ." The form of the Confidential Information Memorandum was prepared in significant part by Arlington, and Arlington did not know that Rail would provide the memorandum to any recipients other than CVC and Berkshire. At the time Rail presented the Confidential Information Memorandum to G&W, G&W had not provided Rail with the "proposed Letter of Intent" referenced in the memorandum. G&W initially offered to purchase Rail for $210 million. Rail rejected the offer, responding that it already had financial buyers who would be willing to pay more than that amount. Rail was presumably referring to CVC and Berkshire, the potential financial buyers that Arlington had previously secured.

On December 17, 2004, Russell and Ken Polk of Arlington met Helms and Mike Durden in Panama City Beach, Florida. During this meeting, Helms told the men from Arlington that Rail was considering taking the deal to G&W or another strategic buyer. Aside from the parties' initial conversations, this was the first time that Rail told Arlington that it might take a deal to a strategic purchaser. Helms stated during the December 17, 2004 meeting that if the sale went to G&W rather than to one of the financial buyers, Rail would "take care of" Arlington.

In early January 2005, Russell had a telephone conversation with Helms and Michael Durden. During this conversation, Rail

officers reiterated that they were considering talking with G&W. Helms or Michael Durden then asked Russell to propose an arrangement for Arlington's compensation in the event that Rail sold to a strategic purchaser.  On January 12, 2005, Russell sent Helms an email which stated in relevant part:

> We talked with the guys at Berkshire.  They understand that we will be giving them some new information and are fine with waiting to get their questions answered.  They would like to get final 2004 numbers as soon as they can. As you can see below, they are bringing in a large group.
>
> As far as our discussion on how we could enter into an agreement with Rail for our services: (just some thoughts)
>
> We would have an attorney draw up an agreement between Rail and Arlington Capital with a fee structure as follows;
>
> Monthly retainer of $7,500 with a minimum and maximum fee of $45,000.  This entire fee will be refunded back to Rail, when and if a deal gets done and our fee is paid by the buyer.  The agreement would clearly state that Rail would not be responsible for any fees other than the retainer.
>
> Let me know your thoughts on this arrangement.

* * *

Russell expected Rail to respond to the January 12, 2005 proposal, possibly with a counter-offer.  Rail did not respond in writing, but Russell testified that the Rail officers responded orally on January 24, 2005 that "[i]f they were intending to talk with [G&W], if it went to [G&W], they would take care of us versus the buyer paying our fee."  Russell thought that the Rail officers' promise to "take care of" Arlington in the event of a deal between Rail and G&W left

8

the issue of Arlington's compensation undefined, and Arlington later testified that "[w]e never . . . got into any details" regarding the question of Arlington's compensation.

At a January 25, 2005 meeting attended by officials from Rail, Arlington, and Berkshire, Earl Durden said that Berkshire would need to raise its bid above the $210 million figure stated in its letter of intent. The representatives from Berkshire responded that they would go back to try to raise the bid. Immediately after the meeting, Earl Durden contacted G&W and proposed to sell Rail to it for $250 million. On Febraury 23, 2005, Berkshire increased its offer to purchase Rail to $220 million. Helms told Russell that he was pleased with Berkshire's increased offer.

On February 28, 2005, G&W signed a letter of intent indicating its willingness to pay $250,000,000 for Rail. Arlington was never in contact with G&W and had no direct role in securing G&W's offer. After G&W signed its letter of intent, Helms told Russell to send Rail a bill for Arlington's retainer ($7500 per month) for the time Arlington had worked investigating potential buyers. When Russell asked if Arlington would receive some fraction of "the value of the deal" between Rail and G&W, Helms told Russell that he would need to speak with Mike and Earl Durden and get back to him.

On March 15, 2005, Russell sent Helms an email indicating his belief that Rail's "take care of" statement entitled Arlington to compensation beyond the $7500 monthly retainer. Russell stated in

9

the email that Arlington added value to the Rail/G&W transaction by
"1) putting the process in motion, 2) giving Rail an indication of
Fair Market Value for the Company, and 3) doing the work to bring
the best buyer to the deal based on what Rail said it wanted
(maximum value but with a financial buyer)."  Russell wrote that
Arlington did "not expect 1% of the transaction value," but proposed
a fee structure wherein Arlington would be compensated at "[a] range
of 1/4 to 1/2 of 1% for the first $200 million [of the purchase
price] and then 1% for anything over $200 million."  Rail rejected
Arlington's proposal.  Instead, Mike Durden asked Arlington to "go
back and come back and give me something else."

    Arlington never submitted a revised proposal.  On May 16, 2005,
Russell sent Mike Durden a one-page letter referring to the proposal
that Russell had made in his March 15, 2004 email to Helms and
requesting Rail to respond by the next day.  On May 20, 2005
Arlington filed this lawsuit in state court.  Rail removed the
action to the United States District Court for the Northern District
of Alabama on June 28, 2005.

                        *Summary Judgment Standard*

    In considering a Rule 56 motion, the court must construe the
evidence and make factual inferences in the light most favorable to
the nonmoving party.  *See Celotex Corp. v. Catrett*, 477 U.S. 317,
322 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970).  The
court may enter summary judgment only if it is shown "that there is

                                   10

no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). At this juncture, the court does not "weigh the evidence and determine the truth of the matter," but solely "determine[s] whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 242-43 (1986) (citations omitted).

*Analysis*

## I. Breach of Contract

Arlington first contends that Rail breached the contract that it says existed when Rail failed to pay it for its services. Arlington asserts that it and Rail entered into a binding oral contract when Helms told Russell that Rail would "take care of" Arlington in the event that Rail took the deal to G&W. Arlington further contends that the contract was formed at a meeting in Birmingham, Alabama, and that Alabama law therefore controls it. Rail counters that the purported contract was, if anything, a modification of the written agreement that was signed by Rail in Panama City Beach, Florida, and that the earlier written agreement declared itself to be "enforceable under Florida law," so that Florida law governs.

### A. Choice of Law

The choice of law in a diversity case is determined by the conflicts rules of the forum state. *Ferrero v. Associated Materials, Inc.*, 923 F.2d 1441, 1444 (11th Cir. 1991). Under

11

Alabama law in this contract dispute, the court must apply the doctrine of *lex loci contractus* to determine which state's substantive law to apply. *Cherry, Bekaert & Holland v. Brown*, 582 So.2d 502, 506 (Ala. 1991). This doctrine states that "a contract is governed by the laws of the state where it is made except where the parties have legally contracted with reference to the laws of another jurisdiction." *Id.*

In arguing that Florida law controls the purported oral contract of December 17, 2004, Rail focuses on the following clause from the October 4, 2004 written agreement between it and Arlington: "We agree until a formal advisory agreement is executed between Arlington Capital, LLC and [Rail] that [Rail] has no legal obligation of any kind whatsoever with respect to any such transaction by virtue of this agreement or otherwise." Rail argues that if Helms's oral assurance to Russell was not a modification of the previous written agreement, Rail cannot be bound by Helms's assurance of December 17, 2004 because the parties previously agreed that Rail would not incur any legal obligation unless and until the parties executed a "formal advisory agreement." Importantly, there is no dispute that Arlington and Rail never executed a "formal advisory agreement" or that the October 4, 2004 written agreement declares itself to be governed by Florida law. Rail argues that because it could not have incurred subsequent legal obligation unless Helms's oral assurance to Russell amounted to a modification

12

of the written agreement, and because that written agreement was enforceable under Florida law, Florida law governs.

The court respectfully disagrees with Rail's choice-of-law position. Rail argues that by entering the written agreement with Arlington, it successfully contracted to insulate itself from the ordinary purview of contract law. Essentially, it contends that after October 4, 2004, it could have accepted from Arlington any consideration in exchange for a carefully articulated oral promise, and broken its promise with impunity, unless a subsequent agreement contained the magic words "formal advisory agreement." This result would violate the spirit of contract law, and to the extent Rail wishes to use the relevant clause from the October 4, 2004 agreement to position itself outside the scope of contract law, that clause is unenforceable. The written agreement did not preclude the parties from executing a subsequent contract, oral or written, regardless of whether or not such a contract was characterized as a "formal advisory agreement."

The purported oral contract, if one exists, must be governed by Alabama law. Arlington says that Helms assured Russell in Birmingham, Alabama that Rail would "take care of" Arlington if Rail sold to G&W, and alleges that Helms's statement created a binding contract between Rail and Arlington. If an oral contract was formed, it was formed in Alabama, and the doctrine of *lex loci*

*contractus* requires this court to apply Alabama law to adjudicate it.

**B. Did Rail Breach a Binding Contract it Made With Arlington?**

In order to prove that Rail is liable for breach of contract, Arlington must show (1) the existence of a valid contract binding upon it and Rail, (2) Arlington's own performance, (3) Rail's nonperformance or breach, and (4) damages. *Armstrong Business Services, Inc v. AmSouth*, 817 So.2d 665 (Ala. 2001). At issue for purposes of Rail's motion for summary judgment is whether an enforceable contract was ever formed. Rail has not raised the statute of frauds, apparently conceding that an oral agreement of the kind relied upon by Arlington is enforceable. In order prove the first element of breach of an oral contract, Arlington must establish the basic elements of a contract: (1) offer and acceptance, (2) consideration, and (3) mutual assent to the essential terms of the agreement. *Id.* Rail contends that the undisputed facts establish that Arlington cannot prove all three elements, asserting that (a) the terms of the alleged contract are undefined and vague, (b) there was no meeting of the minds, and (c) there was no valid consideration. The court interprets Rail's arguments as meaning Arlington cannot satisfy the third (arguments "a" and "b" above) and the second (argument "c" above).

**1.   Was there mutual assent to the essential terms of the purported contract?**

14

Rail first argues that Arlington cannot establish the element essential to the formation of a contract that the terms of the purported contract not be undefined and vague. Specifically, Rail contends that Helms's statement that Rail would "take care of" Arlington if it sold to G&W left the essential compensation term nebulous and undefined.

For a court to treat a contract as void on the grounds of uncertainty, the contract must be so vague and indefinite in its terms that the intention of the parties cannot be fairly and reasonably inferred from them. *Southern United Fire Ins. Co. v. Knight*, 736 So.2d 582, 585 (Ala. 1999). In this case, Helms's "take care of" statement to Russell exhibits just that sort of vagueness and indefiniteness. There is no identification or enforceable measure of the alleged agreement's most essential (from Arlington's perspective) term: that of Arlington's compensation. *See Mantiply v. Mantiply*, --- So.2d ---, 2006 WL 1304936 (Ala. 2006) (finding defendant's statement that plaintiff would be "treated fairly" to be so vague as to be tantamount to no agreement at all). Accordingly, the purported contract between Arlington and Rail is void for being indefinite.

There was also no mutual assent to the essential terms of the contract because there was no meeting of the minds between the parties. "It is well settled that whether parties have entered a contract is determined by reference to the reasonable meaning of the

15

parties' external and objective actions." *SGB Constr. Servs., Inc. v. Ray Sumlin Constr. Co.*, 644 So.2d 892, 895 (Ala. 1994). In order for a contract to have been formed, the parties must have assented to the same thing, in the same sense. *Lilley v. Gonzalez*, 417 So.2d 161, 163 (Ala. 1982). Whether or not there has been mutual assent is judged by an objective, rather than subjective, standard. *Id.*

The "agreement" that Arlington says took effect when Helms told Russell that Rail would "take care of" Arlington is so ambiguous that the court must conclude that there was no meeting of the minds. Although Russell has testified that a "fair" fee to Arlington would be "one percent of the transaction" between Rail and G&W, Arlington has not identified a specific fee that was actually agreed upon by the parties when the "contract" was entered into. If Arlington itself cannot say with any certainty what it and Rail agreed to when Helms told Russell that Rail would "take care of" Arlington, there could not have been a meeting of the minds between Arlington and Rail on December 17, 2004 or on January 24, 2005.

Even if Arlington had contended that the parties agreed to the 1% figure, the court would still conclude that there was no mutual assent. The undisputed evidence reveals that Arlington continued to negotiate with Rail after Rail made the alleged statements. Specifically, Russell wrote in an email on March 15, 2005 that Arlington did "not expect 1% of the transaction value," and proposed compensation in "[a] range of 1/4 - 1/2 of 1% for first $200 million

16

and then 1% for anything over $200 million."  The necessary
inference to be drawn from Russell's continuing to negotiate with
Arlington *after* Helms purportedly bound Rail in contract, is that
there was no meeting of the minds before the negotiations took
place.  A contract was never formed between Rail and Arlington, and
Rail is therefore entitled to summary judgment on Arlington's claim
for breach of contract.

### 2.   Was there consideration?

Rail further contends that Arlington gave no consideration in
exchange for Helms's promise that Rail would "take care of"
Arlington if Rail sold to G&W.  Arlington does not respond to this
assertion, correctly assuming that this is not where it is weak.
Because there was no meeting of the minds, this issue need not be
addressed.

## II. Fraudulent Misrepresentation and Suppression

Arlington claims that Rail misrepresented and/or suppressed
material facts, including, *inter alia*, that Rail was secretly
seeking strategic purchasers, was actively seeking a deal with G&W,
did not actually intend to "take care of" Arlington's compensation,
and, instead, intended to use the offers Arlington secured as
leverage to secure its own offers from strategic buyers.

### A. Fraudulent Misrepresentation

In  order  to  establish  a  claim  for  fraudulent
misrepresentation, Arlington must show that (1) Rail made a false

representation to it, (2) the representation related to an existing material fact, (3) Arlington reasonably relied on the representation to its detriment, and (4) actual damages proximately resulted from the misrepresentation. *See Cowen v. M.S. Enters., Inc.*, 642 So.2d 453 (Ala. 1994).

Rail first contends that Arlington cannot establish all elements of its fraudulent-misrepresentation claim because any reliance Arlington might have placed on Rail's alleged representations could not have been "reasonable" in light of the October 4, 2004 agreement.  That agreement provided that the parties "agree until a formal advisory agreement is executed between Arlington and . . . [Rail] that [Rail] has no legal obligation of any kind whatsoever with respect to any such transaction by virtue of this agreement or otherwise."  Rail contends that Arlington knew that it could incur no legal obligation without signing a formal advisory agreement, and since Arlington concedes that a formal advisory agreement was never signed, any reliance on Rail's alleged misrepresentations would have been unreasonable.

Arlington says that Rail's misrepresentations consisted of Rail telling Arlington that it was considering taking the deal to a strategic purchaser when it had already been in contact with G&W, and Rail assuring Russell that it would "take care of" Arlington if Rail sold to a strategic purchaser.  However, Arlington does not respond to Rail's argument that any reliance on these alleged

18

misrepresentations was unreasonable.  There is no dispute about the substance of the October 4, 2004 agreement, or that the parties never executed a "formal advisory agreement" as contemplated by the October 4, 2004 agreement.  In light of these undisputed facts, whether or not Rail's alleged statements are properly characterized as "misrepresentations" does not matter.  Even though the written agreement did not preclude the parties from entering a subsequent, binding contract, *see supra* at 13, Arlington's assumed reliance on Rail's "misrepresentations" while completely ignoring the substance of the October 4, 2004 written instrument was unreasonable as a matter of law.  Viewing the evidence in the light most favorable to Arlington, the court must therefore conclude that Arlington cannot establish that it "reasonably" relied on any alleged misrepresentations by Rail.

Next, Rail argues that Arlington's fraudulent-misrepresentation claim must fail because the actual damages Arlington claims to have sustained did not proximately result from Rail's "misrepresentations." Arlington asserts that its actual damages are the monies that it was not paid for bringing about the G&W transaction.  Rail argues that there is no proximate link between the alleged "misrepresentations" and Arlington's claimed damages, because Arlington would not have received a cut of the G&W deal whether or not the "misrepresentations" were made.

19

Again, Arlington declines to respond to Rail's argument. Instead, Arlington contends that there are genuine issues of material fact with respect to its fraudulent-misrepresentation claim, but it does not identify any facts – disputed or undisputed – that could possibly establish a causal link between Rail's alleged misrepresentations and the damages it is claiming.  It is undeniable that had Rail told Arlington that it would *not* "take care of" Arlington if it took the deal to G&W, or if Rail had told Arlington that it *was* taking the deal to G&W, Arlington still would be left without a share of the value of the deal between Rail and G&W.  It would be in the same position in which it now finds itself. Arlington does not argue or attempt to present evidence to show otherwise, and in the absence of such evidence, the court cannot allow the issue to proceed to a jury.

In addition to its arguments that Arlington cannot establish "reasonable" reliance or that Arlington's claimed damages were proximately caused by Rail's alleged misrepresentations, Rail presents additional arguments in support of its motion for summary judgment.  Namely, Rail contends that the specific statements it allegedly made – the "take care of" statement to Russell, that it "did not intend" to sell to a strategic purchaser, and that it was "considering" talking to G&W when it had already been in contact with that company – lack the necessary indicia of fraud.  Because the court will grant summary judgment based on Rail's reasonable-

reliance and proximate-causation arguments, it will not discuss the merits of Rail's additional arguments.

## B. Fraudulent Suppression

Arlington also claims that Rail is liable for fraudulent suppression for not having informed Arlington of its discussions with strategic buyer G&W.   Ala. Code § 6-5-102 provides that "[s]uppression of a material fact which the party is under an obligation to communicate constitutes fraud.   The obligation to communicate may arise from the confidential relations of the parties or from the particular circumstances of the case."   In order to be held liable under § 6-5-102, Rail must have had a duty to disclose such information to Arlington.   *Armstrong Bus. Servs., Inc. v. AmSouth Bank, et al.*, 817 So.2d 665, 676 (Ala. 2001).   Following the guidance of the Alabama Supreme Court, this court must consider the following factors in determining whether a duty to disclose existed: (1) the relationship between Rail and Arlington; (2) the relative knowledge of the parties, (3) the value of the particular fact, (4) Arlington's opportunity to ascertain the fact, (5) the customs of the trade, and (6) other relevant circumstances. *See id.* at 677.

Rail contends that it had no duty to disclose any information to Arlington, and that it therefore cannot be liable for fraudulent suppression.   The court agrees.   First, the relationship between the parties favors the nonexistence of any duty to disclose.   Rail and

21

Arlington were separate and independent entities that were negotiating a potential transaction at arms length. Russell, Arlington's managing member who cultivated the relationship between the parties, was a certified public accountant who had over ten years of experience working at one of the "Big Four" international accountancy firms before joining Arlington. Both parties were sophisticated entities during the course of their relationship. Moreover, there was no contractual basis for any duty to communicate or disclose information; the only contract that existed between the two parties was the October 4, 2004 written agreement in which Arlington agreed "to keep strictly confidential all information conveyed to [it] in whatever form . . . regarding [Rail]." Notably, that instrument did not require Rail to disclose any information to Arlington – it merely provided that *if* Rail did provide information to Arlington, then Arlington agreed to keep that information confidential.

The next factor the court must consider, the relative knowledge of the parties, also favors the nonexistence of any duty to disclose. Arlington asserts that it was not and could not have been aware of Rail's alleged intent to take the deal to a strategic purchaser like G&W, but it bases this assertion on its having turned a blind eye to Rail's representations from the time the parties first initiated discussions. Rail officers told Russell during the parties' early conversations that Rail "preferred" to sell to a

22

financial buyer and that its "intent" was to not sell to a strategic buyer.  Although Rail clearly expressed its preference and intent, it did not represent to Arlington that it would only consider taking the deal to a financial buyer, and there is no evidence to suggest that Rail's intent all along was to sell to the highest bidder, even a strategic buyer.  Arlington was on notice from the beginning that Rail might consider trying to sell to a strategic buyer, and it specifically knew that Earl Durden knew a decision maker at G&W.

Consideration of the third factor in the light most favorable to Arlington leans slightly in favor of there having been a duty to disclose.  The particular fact at issue – that Rail was in contact with strategic purchaser G&W while Rail and Arlington were still negotiating – would have been valuable for Arlington to know.  Had Arlington been aware of this fact, it may have altered its negotiating strategy or perhaps ended its negotiations with Rail altogether.  This value is mitigated, however, by the fact that if Arlington had been aware of the fact and had consequently left the negotiating table, it still would not have been contractually entitled to a share of the eventual deal between Rail and G&W.  It would be in the exact same position in which it now finds itself, save for not having expended a few months' worth of time and effort trying to reach a concrete deal with Rail.  Therefore, the fact was valuable to Arlington, but not overwhelmingly so.

The fourth factor, Arlington's opportunity to ascertain the pertinent facts, favors there having been no duty. Arlington was aware from the beginning that Rail might consider taking the deal to a strategic purchaser, and Helms told Russell in December 2004 that Rail was considering a possible sale to G&W in particular. If this did not put Arlington, a sophisticated entity, on actual notice that Rail was talking to G&W, then it certainly provided Arlington the opportunity to ascertain the fact. Arlington does not allege that it ever asked Rail whether Rail was negotiating with G&W, but it would seem that a prudent businessperson would have done so in light of the circumstances. In short, Arlington had an opportunity to ascertain the fact at issue, but chose not to take the appropriate steps to do so.

Fifth and sixth, the court considers the customs of the trade and "other relevant circumstances." Neither party has briefed either of these issues, and the court is itself unfamiliar with any trade customs and unaware of any other "relevant circumstances." These factors are neutral.

In summary, three of the factors favor Rail, one factor slightly favors Arlington, and two factors favor neither party. Balancing the factors, the analysis reveals that Rail had no duty to disclose information to Arlington. Rail therefore cannot be held liable for fraudulent suppression, and its motion for summary

24

judgment on Arlington's fraudulent-suppression claim will be granted.

## III. *Quantum Meruit*

Finally, Arlington claims that it is entitled to recover from Rail under a theory of *quantum meruit*. Regarding the theory of *quantum meruit*, the Alabama Supreme Court has held that "[i]t is settled law of this State that where one knowingly accepts services rendered by another, and the benefit and the result thereof, the law implies a promise on the part of the one accepting with knowledge the service rendered by another to pay the reasonable value of such services rendered." *Hendrix, Mohr & Yardley, Inc. v. City of Daphne*, 359 So.2d 792, 795 (Ala. 1978).

Rail first contends that it is entitled to summary judgment on Arlington's *quantum meruit* claim because Arlington was not the "procuring cause" of the G&W transaction. In support of this argument, Rail offers only one case: *Jennings v. Sugar Sands, II, Ltd.*, 549 So.2d 68 (Ala. 1989). In *Jennings*, the plaintiff real-estate broker introduced the eventual buyer and seller of a piece of real estate. *Id.* at 68. The Alabama Supreme Court explained that because the eventual buyer was not "ready, willing, and able to buy under any terms" at the time the broker made the introduction, the broker had not "procured" the purchaser. *Id.* at 70. The court accordingly affirmed the lower court's finding of summary judgment in favor of the defendant. *Id.*

25

This court does not agree that *Jennings* precludes a finding in favor of Arlington on Arlington's *quantum meruit* thoery.  First, the court reads *Jennings* not to have emphasized the "procuring cause" aspect so much as it emphasized the absence of a "ready, willing, and able to buy" purchaser.  *See id.*  Moreover, the *Jennings* court based its conclusion on the holding from *Vulcan Oil Co., Inc v. Gorman* that "unless the broker has procured a purchaser who is ready, willing and able to buy under the terms of the contract and during the existence of the contract . . . the broker would not be able to recover."  434 So.2d 760, 762 (Ala. 1983).  Notably, the court in *Gorman* referred to *a* ready, willing, and able purchaser – it did not say that the eventual purchaser had to be *the* ready, willing, and able purchaser that the broker procured.  Here, there is substantial evidence that Arlington did indeed procure two ready, willing, and able purchasers: CVC and Berkshire.  That the Rail deal did not go to either of these prospective buyers is immaterial; Arlington nevertheless "procured" them, and *Jennings* did not deal with a situation in which a broker's authorized negotiations were knowingly used by a seller to enhance his bargaining position with a purchaser not "procured" by the broker.  This case presents a unique set of circumstances that opens the door for a *quantum meruit* claim.

Rail contends that it is entitled to summary judgment on the *quantum meruit* claim because Arlington cannot show that it had a

reasonable expectation to receive a commission of $2.5 million from Rail.  The court agrees that if Arlington had (or has) such an expectation, it would not have been a reasonable one.  Indeed, Russell wrote to Helms that Arlington did "not expect 1% of the [$250 million] transaction value," and Rail told Arlington from the beginning that the buyer – not Rail – in any transaction would have to cover Arlington's fee in the event a deal was ever reached.  If Arlington expected to receive $2.5 million from Rail for the services it rendered, its expectation would be patently unreasonable.  But Arlington is not precluded from showing that it had a reasonable expectation for *some* amount of compensation (less – perhaps significantly less – than $2.5 million) from Rail for the services it says it rendered.  *See Utah Foam Prods., Inc v. Polytec, Inc.*, 584 So.2d 1345 (Ala. 1991) (plaintiff must show that it had a reasonable expectation of compensation for its services to be entitled to relief under a theory of *quantum meruit*).  Arlington may be able to show that, in light of Helms's alleged assurance that Rail would "take care of" Arlington if the deal went to a strategic purchaser like G&W, Rail owed Arlington *something* when the deal did in fact go to strategic purchaser G&W.

There is no way to read the Confidentiality Agreement signed by the parties on October 4, 2004, as anything less than an authorization by Rail for Arlington to act in its behalf in seeking a purchaser.  There could be no other reason for Rail to share with

Arlington sensitive financial information that Arlington would need
to perform effectively as a broker.  While the parties stated that
Arlington would be compensated, if at all, by any successful
purchaser it procured, Rail, without doubt, encouraged Arlington to
perform potentially valuable services.  Based on the evidence
construed in favor of Arlington, the services it performed turned
out to be quite valuable to Rail.  If Rail's constricted
interpretation of the relationship were given total credence, it
would mean that Rail could, behind Arlington's back, directly
negotiate a sale to a purchaser that was actually procured by
Arlington, so that Rail, in cooperation with a slick purchaser,
could, with total impunity, cut Arlington out.  Such a set of
circumstances may not be the stuff of which a claim of fraud is
made, but it is the stuff of which a claim for unjust enrichment is
made.  Rail most assuredly knew that Arlington was working for it.
It never said "stop" until it received the benefit of Arlington's
effort.  It even went further.  According to Arlington, Rail said,
"We'll take care of you", an expression entirely consistent with
Arlington's theory of *quantum meruit*.

The Confidentiality Agreement provided, *inter alia*: "Without
prior consent of Rail, we [Arlington] will not disclose to any other
person that we have received information regarding Rail, that we are
in discussions or negotiations with Rail as to a possible financial
transaction or that Rail is considering a possible sale of the

Company". It is obvious that Arlington thereafter did disclose to prospective purchasers, Berkshire and CVC, information it received from Rail. Without that information, Berkshire and CVC could not have made offers. By necessary implication, Rail gave its "prior consent" to Arlington, proving again that it encouraged Arlington to act for it. Furthermore, the fact that Rail never requested Arlington to return the "financial and other written information relating to the Company", as provided by the Confidentiality Agreement, reenforces the idea that a relationship was created by which Rail accepted the benefit of Arlington's efforts. If a jury finds that there was no benefit to Rail, it will not be obligated to pay.

Although legal propositions found in *Corpus Juris Secundum* are sometimes simplistic, they are also often apt. At 12 C.J.S. 611, *Quantum Meruit* § 196, the following apt expression appears:

> . . . an action may be based on quantum meruit where the broker's compensation is not fixed, where the principal wrongfully revokes the contract of employment after the broker has found a purchaser ready and willing to buy, or where the broker has performed a part of the contract only.

Although not a perfect fit, the concept of a *quantum meruit* recovery by a broker, as described in C.J.S., prevents a principal from accepting services that can reasonably be anticipated, and becomes unjustly enriched by enjoying the broker's efforts without paying for them.

29

Rail contends that it is entitled to summary judgment under Arlington's *quantum meruit* theory because the case presents no manifest injustice.   The court believes that when the facts are viewed in the light most favorable to Arlington, it is reasonable to conclude that the more likely manifest injustice would occur if Arlington does not receive reasonable compensation for the services it says it performed ostensibly to help bring about G&W's $250 million successful offer.   That Rail contacted G&W to begin negotiations the next business day after receiving letters of intent from CVC and Berkshire, and that Rail asked Arlington to propose a compensation arrangement in the event of a sale to a strategic buyer – while Rail was already deeply engaged in negotiations with such a strategic buyer – are facts that, if proven, could cause a jury to conclude that Arlington is entitled to be reasonably compensated.

For the foregoing reasons, the court will deny Rail's motion for summary judgment of Arlington's *quantum meruit* claim.

### Conclusion

In accordance with the foregoing, Rail's motion for summary judgment will be granted in part and denied in part.

DONE this 29th day of January, 2007.

WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT JUDGE

30